# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| KANSAS CITY SOUTHERN | ) | |
| RAILWAY COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 05-3063 |
| | ) | |
| BROTHERHOOD OF LOCOMOTIVE | ) | |
| ENGINEERS & TRAINMEN, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

RICHARD MILLS, U.S. District Judge:

Both the Railroad and the Union move for summary judgment.

The Union prevails.

## FACTS

Plaintiff Kansas City Southern Railway Company (the "Railroad")

is a railroad engaged in interstate transportation as defined by the

Railway Labor Act ("RLA"), 45 U.S.C. §§ 151, *et seq*.

Defendant Brotherhood of Locomotive Engineers & Trainmen (the

Union") is a labor organization subject to the RLA and is the duly

1

designated representative of the craft or class of locomotive engineers employed by the Railroad.

The Railroad employed S.J. Pulice and J.R. Sommers as locomotive engineers, but the Railroad terminated both of them for vandalizing its property.

The Railroad and the Union are parties to a Collective Bargaining Agreement ("CBA") governing the rates of pay, rules, and working conditions of the Railroad's locomotive engineers. Article 50 of the CBA contains a grievance/arbitration procedure setting forth the mechanism by which the Union or its members may challenge the termination of an employee's employment, including specific time limits by which the Union and/or its members must take certain actions in order to do so. The procedure set forth in Article 50 is commonly found in agreements between various U.S. railroads and rail labor unions.

In the fall of 1997, a wildcat strike began in Shreveport, Louisiana, and spread throughout the Railroad's entire railroad system. Several acts of vandalism were committed against the Railroad's equipment and

property.  In Heavener, Oklahoma, vandals slashed 202 air hoses (both airlines and brakelines) during the strike.

In July 2001, the Railroad's Director of Claims Rodney Tatum received a phone message from Kim Holt, S.J. Pulice's ex-wife.  Ms. Holt claimed to have information about the 1997 vandalism in Heavener, Oklahoma.  She signed a sworn affidavit implicating Pulice and Sommers.  Her August 8, 2001, affidavit stated that:

> One evening during September or October of 1997, Mr. Pulice waited at our home until our children went to bed. Mr. Pulice then dressed himself in camouflage clothing and applied black paint to his face.  I asked Mr. Pulice what he was doing and he replied that it was none of my business. Mr. Pulice left our home at approximately 10:00 p.m. that same evening, and he returned approximately 3:00 or 4:00 a.m.  Mr. Pulice told me that he had been out with other KCS employees that evening.   He told me that he and other KCS employees had cut and otherwise sabotaged airlines and brakelines on KCS trains parked at Heavener and Sallisaw. Mr. Pulice did not name all of the KCS employees who went with him, but he did specifically state that Jerry Sommers was one of those employees.  Mr. Pulice told me that he and other KCS employees cut the airlines and brakelines in an effort to disrupt the operations of the KCS and further the interests of the KCS employees during the strike.  Mr. Pulice did not tell me anything else about his activities during that strike.

Holt's Affidavit went on to say that:

. . . during July of 2001, I was talking on the phone to one of
my daughters, who was at Mr. Pulice's home at the time the
telephone conversation took place. I overheard Mr. Pulice
yelling in the background, and my daughter said that her
father (Mr. Pulice) was mad at the KCS. I specifically heard
Mr. Pulice yelling that he would "disable every goddamn train the KCS had if h

On August 15, 2001, the Railroad advised Sommers and Pulice that

it would conduct an investigative hearing to determine their involvement

in the Heavener vandalism. James D. Freeman held an investigative

hearing on August 21, 2001. Freeman issued his findings three days

later. He concluded that the evidence at the investigative hearing

substantiated that Sommers and Pulice vandalized the Railroad's

equipment around the time of the 1997 wildcat strike.

Freeman found that the vandalism violated the Railroad's General

Code of Operating Rules, including Rule 1.6, Items 1, 2, 4, 8, Rule 1.9,

and Rule 1.23, which prohibit desertion from duty, making false reports

or statements, concealing facts concerning matters under investigation

and serious violations of the law, as well as unauthorized alterations to

equipment.

The Railroad consequently discharged Pulice and Sommers on

August 24, 2001.

## PROCEDURE

Article 50(a) of the CBA sets forth the time limit for filing a grievance. It states that "all claims and grievances must be presented in writing by or on behalf of the employee involved, to the officer of the company authorized to receive the same, within sixty days from the date of the occurrence on which the claim or grievance is based." Although Pulice and Sommers mailed the Railroad their grievances on September 24, 2001, the Railroad first became aware that they were challenging their terminations when the Union wrote to the Railroad to inquire about the status of the grievances. The Railroad received that letter on December 14, 2001. By letter dated December 14, 2001, the Railroad advised the Union that it had not received any grievances relating to the discharge of Pulice and Sommers.

The Union responded by sending the Railroad copies of two letters it claimed to have originally mailed in September 2001, grieving Pulice's and Sommers' discharge. The Railroad received the Union's letter on

December 27, 2001.  The letter stated that, if the Railroad did not

receive the grievances, "they must have been lost during the September

11th [sic] and the anthrax scare."  The Union also asked the Railroad to

conduct an "on-property" review of the discharge decision pursuant to

Article 50(b) of the CBA.

The Railroad conducted the initial on-property review, but then

issued a January 2, 2002, letter denying the grievances because they were

untimely under Article 50(a) and failed on the merits.  On January 27,

2002, the Union asked the Railroad's Director of Labor Relations,

Kathleen Alexander, to review the denial.  Ms. Alexander, the highest

officer designated to handle such matters at the Railroad, denied the

grievances via a March 4, 2002, letter that she mailed to the Union.  The

letter stated that the grievances were being denied because they were

untimely and meritless.

The Union then sought review under Article 50(c) of the CBA.

Article 50(c) states that:

> Decisions by the highest officer designated to handle claims
> and grievances shall be final and binding unless within sixty

(60) days after written notice of the decision of said officer, he is notified in writing that his decision is not accepted. All claims or grievances involved in a decision of the highest officer **shall be barred** unless within six (6) months from the date of said officer's decision proceedings are instituted by the employee or his duly authorized representative before a tribunal having jurisdiction pursuant to the law or the agreement of the claim or grievance involved. It is understood, however, that the parties may by agreement in any particular case extend the six (6) month period herein referred to.

The Union did not, however, institute any proceedings over the grievances within six months of Ms. Alexander's denial.

On December 6, 2002, Ms. Alexander issued written notice of her decision to deny the grievances, the Union instituted arbitration proceedings before the National Railroad Adjustment Board ("NRAB")—a body created by § 3, First of the RLA, 45 U.S.C. § 153, which is composed of an equal number of carrier members and union members. If these partisan members of the NRAB are unable to resolve a dispute, a neutral arbitrator is appointed to hear and decide the case. As an alternative to the NRAB, the parties may, by written agreement, eliminate the requirement that the Union notify the Railroad in writing

within 60 days that it disputes the Railroad's final denial of the grievance. The parties may also enter into written agreements creating private arbitration boards called Public Law Boards ("PLBs") or Special Boards of Adjustment to arbitrate unresolved grievances. These boards typically consist of one member appointed by the carrier, one appointed by the union, and a neutral arbitrator who actually decides the dispute.

Following the Union notice, the parties sent their submissions to the NRAB. When the NRAB's partisan members deadlocked, Arbitrator Edwin Benn was appointed to resolve the grievances. The Railroad argued that the grievances were barred under Articles 50(a) and (c).

The Union argued that it had mailed the grievances on September 24, 2001, and that the grievances must have been lost in the mail due to the anthrax scare that arose shortly after the events of September 11, 2001. The Union did not address its failure to comply with the six-month time limit found in Article 50(c).

On February 14, 2005, Arbitrator Benn overturned Sommers' and Pulice's terminations. Mr. Benn found that there was insufficient

evidence to show the two men vandalized the Railroad's property.  Mr.

Benn refused to enforce Article 50(a) and (c)'s time limits because he

concluded that the Union timely "presented" its grievances to the

Railroad when it mailed grievances on September 24, 2001.  Moreover,

Mr. Benn concluded that Ms. Holt recanted her vandalism allegations via

a letter written to Pulice.  The letter stated:

> I am writing to you in hopes of [sic] KCS will reconsider their
> decision of firing Mr. Pulice and Mr. Sommers.  I was going
> through a difficult time, a custody battle with Mr. Pulice and
> with malice did implicate [sic] these two gentlemen in the
> destruction of railroad property.  I deeply regret my actions
> and ask you again to reconsider.

Mr. Benn also found that the parties waived the six-month time

requirement in past PLB cases and, by doing so, they created a blanket

waiver of the six-month time limit for all grievances.

Mr. Benn reinstated Pulice and Sommers to their former positions

and awarded them backpay.  The Railroad filed the instant case on

March 22, 2005, asking the Court to vacate the arbitration award.  On

May 20, 2005, the Union filed a cross-petition, asking the Court to

enforce it.

## STANDARD OF REVIEW

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact." Fed.R.Civ.P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-movant's evidence is to be believed and all justifiable inferences are to be drawn in its favor. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court may grant a motion for summary judgment only when the record shows that a reasonable jury could not find for the non-movant. <u>Id</u>. at 248, 106 S.Ct. 2505.

The non-movant may withstand summary judgment only by showing that the evidence is such that a reasonable jury could render a verdict in its favor. <u>Id</u>. The non-movant may not merely rest upon the allegations or details in his pleading, but must set forth specific facts showing that there is a genuine issue for trial. <u>Celotex</u>, 477 U.S. at 322, 106 S.Ct. 2548; <u>Anderson</u>, 477 U.S. at 248, 106 S.Ct. 2505.

## ANALYSIS

Section 3 First (q) of the Railway Labor Act (45 U.S.C. § 153 First (q)), allows a district court to set aside a NRAB award in whole or in part, or to remand a matter, due to:  (1) failure of the board to comply with the requirements of the RLA; (2) failure of the board to confine itself to matters within its jurisdiction; (3) fraud or corruption by a member of the board making the award.  Id.; see also Kulavic v. Chicago & Illinois Midland Ry. Co., 1 F.3d 507, 513 (7th Cir. 1993).  The scope of a court's review is "among the narrowest known to the law."  See Kulavic, 1 F.3d at 513.  "[N]arrow review is not the equivalent of no review at all."  Lyons v. Norfolk & W. Ry. Co., 163 F.3d 466, 468 (7th Cir. 1999).  However, if a party's objections do not fall within any of these three categories, the findings and order of the Board are conclusive and may not be set aside.  See Union Pacific Railroad v. Sheehan, 439 U.S. 89, 93, 99 S.Ct. 399, 402, 58 L.Ed.2d 354 (1978).

An arbitrator's award is within the scope of his jurisdiction so long as he contains his decision to the terms of the agreement between the

11

employer and the union.  See Lyons, 163 F. 3d at 469.  In Lyons, a
railway company terminated an employee because he failed to provide a
urine sample.  A PLB found that it was not "unjust" for the company to
fire the employee for this reason.  Id. at 470.  The former employee and
union asked the district court to overturn the PLB's decision.  The
district court concluded that the PLB correctly decided the issue.  The
Seventh Circuit affirmed, stating: "It is not for us to decide if this
conclusion is correct; it is sufficient for us to say that in arriving at this
conclusion, the PLB was interpreting the contract term "unjust."  Id. at
470.

As in Lyons, the question here ". . . is not whether the arbitrator
erred in interpreting the contract; it is not whether they clearly erred in
interpreting the contract; it is not whether they grossly erred in
interpreting; it is whether they interpreted the contract.  If they did, their
interpretation is conclusive."  Id., quoting Hill v. Norfolk & Western Ry.,
814 F.2d 1192, 1196 (7th Cir. 1987).  Arbitrator Benn concluded that
Pulice and Sommers presented their grievances to the Railroad when the

grievances were placed in the mail on September 24, 2001. The arbitrator reached this decision by broadly interpreting the term "present". Right or wrong, his interpretation is conclusive. The Court, therefore, finds that the arbitrator's decision complies with the RLA.

The Railroad next argues that the arbitrator exceeded his jurisdiction by disregarding the CBA's plain language and fashioning a brand of justice that allowed untimely grievances. An arbitrator exceeds his jurisdiction when he disregards the plain language of the contract "and implements [its] own notions of what is fair and reasonable." Hill v. Norfolk & W. Ry. Co., 814 F.2d 1192, 1195 (7th Cir. 1987); Anheuser-Busch, 280 F.3d at 1138 (arbitrator cannot ignore plain language of contract and "dispense his own brand of industrial justice").

Article 50(a) of the instant CBA requires that "all claims and grievances must be presented in writing by or on behalf of the employee involved, to the officer of the company authorized to receive the same, within sixty days from the date of the occurrence on which the claim or grievance is based." The Railroad claims that because "present"

13

commonly means "to bring or introduce into the presence of someone," or "to lay (as a charge) before a court as an object of inquiry, Article 50(a) unambiguously required that the Railroad received Pulice's and Sommer's grievances within 60 days of their August 24, 2001, discharges.

Contrary to the Railroad's position, it is not unreasonable to conclude that Pulice's and Sommers's grievances were presented at the time they were mailed. The term "present" is broad enough to be read that way. Moreover, Arbitrator Benn acted within his authority when he interpreted the term "present" to mean that a party satisfies its obligation by placing a grievance in the mail. Because Arbitrator Benn is empowered to interpret the CBA, he did not exceed his jurisdiction via his interpretation. It is true that his decision is at odds with determinations in other arbitration cases. See Brotherhood of Maint. of Way Employes v. Consolidated R. Corp., NRAB Award No. 26549, at 2 (3rd Div. Sept. 30, 1987) (a claim is deemed "presented" on the date it is received by the carrier). However, that is not a basis for reversal. Each arbitration is decided on its own facts.

14

The Railroad also argues that Arbitrator Benn exceeded his jurisdiction by ignoring the six month time limit found in Article 50(c). In order to prevail on its claim, the Railroad must show that Arbitrator Benn's decision is "without foundation in reason or fact," or wholly baseless and without reason.  See Anderson v. National R.R. Passenger Corp. (AMTRAK), 754 F.2d 202, 203 (7th Cir. 1984) (citations omitted).  "Although plaintiff may disagree that the evidence underlying the Board's decision is adequate, the sufficiency of the evidence comprising the foundation of the Board's decision is not reviewable.  The Board's determination is conclusive."  Id. at 204, citing Kotakis v. Elgin, Joliet & Eastern Railway, 520 F.2d 570 (7th Cir.) cert. denied, 423 U.S. 1016, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975); Edwards v. St. Louis-San Francisco Railroad, 361 F.2d 946 (7th Cir.1966).

Here, Article 50(c) of the CBA provides that the Union was required to institute arbitration proceedings within six months of the March 4, 2002, decision to deny the grievances.  The Union did not institute arbitration until December 6, 2002—nine months and two days

15

after the denial.

Article 50(c) permits the parties by agreement to extend the six-month deadline "in any particular case."  Arbitrator Benn's Award stated:

> Consistent with the language in Article 50(c), the Organization contends that the parties have waived that six month requirement and the appeal to this Board is timely. The Carrier acknowledged that it has waived the six month requirement for cases proceeding to Public Law Boards but did not know if the same held for cases going to the [NRAB]. Given that the parties have waived the six month requirement for cases going to Public Law Boards and further given the uncertainty attached to similar appeals to the [NRAB], we are unwilling to find that the waiver applicable to Public Law Boards does not apply to cases going to [the NRAB] so as to bar this dispute.

See Joint Ex. 1 at 0210-11.

The Railroad reads Arbitrator Benn's decision to create a blanket waiver of the six month requirement, instead of limiting his conclusion to the particular case he was hearing.  The Court cannot agree.

Although the arbitrator broadly concludes that the evidence shows the Railroad waived the six month requirement, he ultimately limits his finding to "this dispute."  Moreover, Arbitrator Benn supported his finding with reason when he laid out the parties' conduct and course or

16

dealings.  The Railroad questions the sufficiency of this evidence, but Arbitrator Benn's findings are not reviewable in that regard.  <u>See</u> <u>Anderson</u> , 754 F.2d at 204.

## CONCLUSION

Because Arbitrator Benn limited his conclusion to the case at bar, he did not exceed his jurisdiction.  <u>Id</u>.  Therefore, the Railroad's summary judgment motion must be denied.  As the Railroad has not met its burden of showing that reversal is in order, the Court affirms the arbitrator's decision.  This, of course, means that the Union has prevailed on its summary judgment motion since that motion merely sought an affirmance.

<u>Ergo</u>, Plaintiff Kansas City Southern Company's Motion for Summary Judgment (d/e 9) is DENIED and Defendant Brotherhood of Locomotive Engineers & Trainmen's Motion for Summary Judgment (d/e 11) is ALLOWED.

This case is CLOSED.

IT IS SO ORDERED.

17

ENTER:  March 14, 2006

FOR THE COURT:

s/ Richard Mills
United States District Judge